UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

| | |
|---|---|
| PATRICIA E. FLYNN,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>WELLS FARGO BANK, N.A.; and DOES 1-47 inclusive,<br><br>　　　　Defendants. | No. 2:19-cv-00116-WBS-KJN<br><br><u>MEMORANDUM AND ORDER RE:<br>MOTION TO DISMISS PLAINTIFF'S<br>SECOND AMENDED COMPLAINT</u> |

----oo0oo----

Plaintiff Patricia E. Flynn asserts state statutory and common law claims against defendant Wells Fargo Bank. Plaintiff's claims arise out of Wells Fargo's alleged mishandling of her loan modification application and alleged wrongful foreclosure on her home. Presently before the court is defendant's Motion to Dismiss Plaintiff's Second Amended Complaint ("SAC"). (Docket No. 24.)

I. <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

In January 2006, plaintiff entered into a consumer loan transaction with defendant Wells Fargo to refinance her home, a

1

single-family residency located at 2540 6th Avenue in Sacramento, California ("the subject property"). (SAC ¶¶ 1, 10.) Shortly thereafter, Wells Fargo took a security interest in the subject property; it also recorded a deed of trust with the Sacramento County's Recorder's Office. (Id. ¶ 10.)

In May 2016, plaintiff submitted a request for a loan modification to Wells Fargo. (Id. ¶ 14.) She had experienced a "material change in financial circumstance" and wanted to secure a lower interest rate. (Id.) Plaintiff then received three letters from defendant, all dated July 19, 2016. (Id. ¶ 16.) One letter denied plaintiff's modification application on the grounds that Wells Fargo did not have the contractual authority to modify plaintiff's loan. (Id.) The second letter stated that Wells Fargo was unable to create an affordable mortgage payment for plaintiff based on her gross monthly income and stated that "[y]ou or a co-borrower have reached the allowable number of modifications." (Id.) The third letter acknowledged receipt of plaintiff's application and advised her that she may need to submit additional documents. (Id.)

Plaintiff alleges that in the months that followed, she received multiple solicitations from Wells Fargo for home loan modifications. (Id. ¶ 17.) Under California's Homeowner Bill of Rights, Wells Fargo was required to provide plaintiff a "single point of contact" who could assist her in the loan modification process. Plaintiff alleges that throughout the period at issue in the complaint, she was subjected to a "revolving door" of single points of contact (id. ¶ 20) and Wells Fargo changed her single point of contact as many as four times in a single month.

(Id. ¶ 81.) She alleges that the frequency with which Wells Fargo changed her designated single point of contact hindered her ability to navigate the loan modification process. (Id. ¶ 87.)

Plaintiff alleges that on March 30, 2017, defendant Wells Fargo recorded a Notice of Default against the subject property, though at that time, Wells Fargo had her complete loan modification application which it had not reviewed. (Id. ¶ 35.)

On April 25, 2017, plaintiff attended Wells Fargo's annual shareholder meeting as the guest of Sister Nora Nash, the director of the Interfaith Center on Corporate Responsibility ("Interfaith Center" or "ICCR"). (Id. ¶ 37.) The Interfaith Center represents a coalition of more than 300 global institutional investors who collectively hold more than $400 billion in managed assets. (Id.) At the meeting, plaintiff publicly shared her negative experiences with the loan modification process. (Id.) Defendant Timothy Sloan, Wells Fargo's CEO, then promised plaintiff he would "personally investigate" her case. (Id. ¶ 38.) Plaintiff alleges that Sloan made this representation because he wanted to placate Sister Nora Nash and other interested shareholders at the meeting. (Id.) Sloan then directed plaintiff to go into the foyer and speak to Anthony Bennum, a Wells Fargo representative. (Id.) She did so, and Anthony Bennum told her that he would be her new single point of contact and would "help" her. (Id. ¶ 40.) Plaintiff alleges that Bennum "specifically reiterated the promise of Timothy Sloan that they would investigate her home loan modification application and that if mistakes were found in the process, Plaintiff's home certainly would not be foreclosed without a new

3

application being appropriately evaluated and processed by Wells Fargo." (Id.)

Plaintiff alleges that after her conversation with Bennum at the Wells Fargo annual shareholder meeting, Bennum repeatedly made false representations to her. Specifically, she alleges that even though Bennum and Wells Fargo knew that plaintiff was ineligible for loan modification, Bennum told plaintiff that Wells Fargo would work on a loan modification for plaintiff. (Id. ¶ 100.) Plaintiff alleges that during telephone conversations on June 15, 2017, July 25, 2017, and August 10, 2017, Bennum again deceitfully told plaintiff that Wells Fargo was working on the proposed loan modification. (Id.) Plaintiff also alleges that on July 3, 2017, Bennum emailed her and said he was submitting the results of Wells Fargo's review to Keep Your Home California,[1] though plaintiff alleges that at the time of this email, Bennum knew that this was a "futile act." (Id.) On July 14, 2017, Wells Fargo employee Grace Yang emailed plaintiff's loan modification proposal to Keep Your Home California. On July 20, 2017, however, Grace Yang acknowledged to Keep Your Home California that the wrong debt to income ratio had been used on plaintiff's file. (Id. ¶¶ 47, 49.)

On August 17, 2017, Wells Fargo informed plaintiff that her loan modification had been denied because the property had already received the maximum number of modifications allowed. (Id. ¶ 53.) On October 6, 2017, plaintiff received a letter from Wells Fargo stating that her loan was in default and that Wells

---

[1] Keep Your Home California is a state-sponsored mortgage assistance program.

4

Fargo would pursue foreclosure alternatives. (Id. ¶ 55.) On November 7, 2017, Wells Fargo recorded a Notice of Trustee's Sale against the subject property. (Id. ¶ 56.) The sale took place on December 1, 2017. On December 12, 2017, plaintiff received the trustee's deed upon sale that was recorded against the subject property and was served with a 3-Day Notice to Quit. (Id. ¶¶ 57-58.)

Plaintiff alleges that "if plaintiff's home loan [was] in fact not one that could be modified, the President's office of Wells Fargo could deliver such news within a month, if not minutes." (Id. ¶ 41). She alleges that she was subjected to the months long back-and-forth with Bennum about her loan modification application as part of a deliberate subterfuge designed by Wells Fargo to "distract Sister Nora Nash, [the Interfaith Center on Corporate Responsibility] and others from [Wells Fargo's] wrongful business practices." (Id.) This subterfuge, plaintiff alleges, left plaintiff "as the innocent pawn in a much broader scheme of potentially securing of 400 billion dollars of investment money to Wells Fargo." (Id.)

Plaintiff further alleges that, acting in reliance on Bennum's misrepresentations, she declined to pursue available private money loans. (Id. ¶ 110.) Subsequently, by the time her appeal of the modification denial was denied, on September 21, 2017, she did not have sufficient time to refinance her mortgage loan or cure her arrearage. (Id.) This inability was also due in part, the Second Amended Complaint alleges, to the fact the plaintiff's loan balance with Wells Fargo "included misapplied payments to her principal and thousands of dollars of additional

5

fees, including fees from the multiple failed modification processes, totaling approximately $10,000."[2] (Id.) "Had [p]laintiff known the true amount she owed at the time of the denial of her appeal . . . she could have obtained the financing to correct her arrearage." (Id.)

In November 2018, plaintiff filed this action in the Superior Court, State of California, County of Sacramento. (See Docket No. 1-1.) Defendant Wells Fargo removed the case to this court on January 17, 2019 (Docket No. 1), and on March 18, 2019, plaintiff filed her First Amended Complaint, which added Wells Fargo CEO Timothy Sloan as well as two individual Wells Fargo employees as defendants. (See Docket No. 9.)

The court granted Wells Fargo's Motion to Dismiss the First Amended Complaint ("FAC") as to all claims against Sloan and as to all claims except certain alleged violations of California's Homeowners Bill of Rights. (See Order Re: Mot. to Dismiss (Docket No. 19).) Plaintiff then filed her Second Amended Complaint asserting violations of the Homeowner Bill of Rights, fraud, negligent misrepresentation, negligence, wrongful foreclosure, and violations of California's Unfair Competition Law ("UCL"), Cal. Bus & Prof. Code § 17200, et seq. (Docket No. 23.) Defendant now moves to dismiss plaintiff's fraud, negligent misrepresentation, negligence, wrongful foreclosure, and UCL claims, as well as plaintiff's requests for punitive and treble damages. (Docket No. 24.)

---

[2] Plaintiff had previously, unsuccessfully, attempted to correct these alleged accounting errors with Wells Fargo. (Id.)

6

II. LEGAL STANDARD

On a motion under Federal Rule of Civil Procedure Rule 12(b)(6), the inquiry before the court is whether, accepting the allegations in the complaint as true and drawing all reasonable inferences in the plaintiff's favor, the plaintiff has stated a claim to relief that is plausible on its face. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

III. DISCUSSION

A. Fraud

Under California law, "the elements of fraud are: (1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage." Robinson Helicopter Co. v. Dana Corp., 34 Cal. 4th 979, 990 (2004).

Fraud claims are held to a higher pleading standard than other claims; to survive a motion to dismiss, such claims must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b) ("Rule 9(b)"). Under Rule 9(b), "[a]verments of fraud must be accompanied by the 'who, what, where, when, and how' of the misconduct charged." Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir. 2003)

(quoting Cooper v. Pickett, 137 F.3d 616, 627 (9th Cir. 1997)). In addition to identifying the particulars of the alleged fraud, Rule 9(b) requires that a plaintiff "must 'set forth what is false or misleading about a statement, and why it is false.'" Rubke v. Capitol Bancorp Ltd., 551 F.3d 1156, 1161 (9th Cir. 2009) (quoting Yourish v. Cal. Amplifier, 191 F.3d 983, 993 (9th Cir. 1999)).

In its order regarding defendant's Motion to Dismiss Plaintiff's First Amended Complaint, the court found that plaintiff's allegations regarding Bennum's alleged misrepresentations to plaintiff were insufficiently particular under Rule 9(b)'s heightened pleading standard. (Order Re: Mot. to Dismiss FAC at 23-25.) The Second Amended Complaint remedies this deficiency by providing concrete details about the content, timing, and delivery of Bennum's misrepresentations to plaintiff. For example, the Second Amended Complaint alleges that during a telephone conversation on April 28, 2017, Bennum told plaintiff that Wells Fargo would work with Keep Your Home California on a loan modification. (SAC ¶ 100.) This representation was misleading, the SAC alleges, because, at the time he made it, Bennum knew that Wells Fargo did not have the ability to make any loan modifications to plaintiff's loan. (Id.) The Second Amended Complaint also adequately alleges with particularity that these misrepresentations were made to deceive plaintiff. Specifically, plaintiff alleges that Bennum and Wells Fargo sought to deceive plaintiff about the prospects of her loan modification application "so as to deflect attention away from their flawed loan modification application" and to "placate

8

Sister Nora Nash, the $400 billion of investment dollars [sic] and Wells Fargo's investors." (Id. ¶ 102.)

The Second Amended Complaint also adequately alleges that (1) plaintiff reasonably relied on Wells Fargo's alleged misrepresentations and (2) she was harmed by such reliance. Plaintiff states that between April 2017 and August 2017, she acted in reliance on Bennum's misrepresentation in declining to pursue alternatives to loan modification. (See id. ¶¶ 110-111.) The reasonableness or justifiability of plaintiff's alleged reliance is a question of fact not appropriately addressed at the motion to dismiss stage. See Gerard v. Wells Fargo Bank, N.A., No. CV-14-03935-MMM-SHx, 2014 WL 12599606, at *9 (C.D. Cal. Sept. 11, 2014) (declining to dismiss fraud claims arising out of loan modification negotiations based on purported unreasonable reliance because the reasonableness of the plaintiff's alleged reliance on defendant's statements "is a question of fact to be resolved at a later stage of the proceedings."). The court cannot say at this stage that it was unreasonable for plaintiff to not fully pursue other options to stay in her home while she was pursuing a loan modification and appeal with Wells Fargo.

With respect to causation, plaintiff must allege a causal nexus between plaintiff's reliance and her injuries. See Conrad v. Bank of Am., 45 Cal. App. 4th 133, 159-160 (3d Dist. 1996) ("Misrepresentation, even maliciously committed, does not support a cause of action [for fraud] unless the plaintiff suffered consequential damages."). The Second Amended Complaint does so by alleging that "if Wells Fargo had advised [p]laintiff in May or June 2017 that they [sic] could not modify her loan,

9

she would have been able to overcome the time frame, clear up misapplied payments and fees on her account, and could have paid her arreage or finalized the refinance of her loan[.]" (SAC ¶ 111.) Notwithstanding defendant's arguments to the contrary, the court cannot say that as a matter of law, plaintiff was not harmed by defendant's alleged fraud after she learned her modification request had been denied on August 17, 2017. The Second Amended Complaint alleges that she pursued an unsuccessful appeal of her loan modification and was not informed of that denial until September 21, 2017, only 60 days before the scheduled foreclosure sale. (Id. ¶ 110.) Overall, plaintiff has plausibly alleged that if she had more time, i.e., she had learned of the alleged fraud earlier, she could have in fact obtained private money loans to prevent the foreclosure sale and remain in her home. Accordingly, the court will deny the Motion to Dismiss the fraud claim.

        B.    Negligent Misrepresentation

The elements of negligent misrepresentation under California law are: "(1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage." Apollo Capital Fund, LLC v. Roth Capital Partners, LLC, 158 Cal. App. 4th 226, 243 (2d Dist. 2007). To succeed with a claim for negligent misrepresentation, a plaintiff must show a "causal nexus" between the alleged misrepresentation and the damage. Goehring v. Chapman Univ., 121 Cal. App. 4th 353, 366 (4th Dist. 2004). The

court's reasoning with respect to the Second Amended Complaint's fraud claim applies equally to the negligent misrepresentation claim. Accordingly, the court will deny the Motion to Dismiss as to the negligent misrepresentation claim.

### C. Negligence

To prevail on a negligence claim under California law, a plaintiff must show the existence of a legal duty, that that duty was breached, and that the breach was a proximate or legal cause of plaintiff's injuries. Merrill v. Navegar, Inc., 26 Cal. 4th 465, 477 (2001). The existence and scope of a duty are legal questions for the court. Id. (citation omitted). Generally, "a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money." Nymark v. Heart Fed. Sav. & Loan Ass'n, 231 Cal. App. 3d 1089, 1096 (3d Dist. 1991) (citations omitted). However, this rule is not a "sweeping conclusion that a lender *never* owes a duty of care to a borrower." Newson v. Countrywide Home Loans, Inc., No. C 09-5288 SBA, 2010 WL 4939795, at *5 (N.D. Cal. Nov. 30, 2010) (emphasis in original); see Jolley v. Chase Home Fin., LLC, 213 Cal. App. 4th 872, 901 (1st Dist. 2013) ("Even when the lender is acting as a conventional lender, the no-duty rule is only a general rule.").

In the order dismissing the negligence claim from plaintiff's First Amended Complaint, this court reaffirmed its longstanding view that absent some special relationship, in the context of a claim for negligence, a lender does not owe a duty of care to borrowers. (Docket 19 at 27-28 (and citations

therein).)[3]  After reviewing the First Amended Complaint's allegations regarding Wells Fargo CEO Timothy Sloan's statement that he would "look into" plaintiff's application and Bennum's representation that he would "help" plaintiff with her application, the court found that these statements did not indicate the existence of a "special relationship" between plaintiff and Wells Fargo.  It noted that, "[t]o plausibly claim that her relationship with Wells Fargo or Bennum was not a conventional relationship between a borrower and a lender, but rather, a 'special relationship' giving rise to a duty of care, plaintiff would need to allege more substantial expressions of solidarity and solicitations of trust by Sloan or Bennum."  (Id.)

        The Second Amended Complaint reiterates its predecessor's allegations that Sloan told plaintiff he would "personally look into" plaintiff's case and that Bennum said he would "help" her with her loan modification application.  (SAC ¶¶ 38, 40.)  It also, however, contains new, more detailed allegations regarding the scope of Bennum's involvement with plaintiff during the loan modification process.  Some of these allegations concern conduct that falls clearly within the scope

---

[3] After this motion was filed, the California Court of Appeal for the Second District weighed in on whether a lender owes a duty of care during the loan modification process, surveying various court opinions in and outside California and holding that a lender does not owe a borrower a common law duty to offer, consider, or approve a loan modification. Sheen v. Wells Fargo Bank, N.A., No. B289003, --- Cal. Rptr. 3d ----, 2019 WL 3543079, at *3-7 (Ct. App. Aug. 5, 2019).  However, this new decision is not dispositive, given the continuing conflict among California Courts of Appeal (and federal district courts within California), as well as the absence of guidance from the California Supreme Court.

12

of the conventional relationship between a borrower and a lender.
For example, the Second Amended Complaint alleges that on August
10, 2017, Bennum "solicited [p]laintiff's trust by stating that
both he and Alfredo Medina would be working directly with [Keep
Your Home California]." (Id. ¶ 128.)  Other allegations,
however, collectively suggest that plaintiff's relationship with
Wells Fargo exceeded the bounds of the typical relationship
between a lender and borrower.

        For example, the Second Amended Complaint alleges that:
(1) On April 25, 2017, when Bennum spoke with plaintiff in the lobby of the shareholders' meeting, he told plaintiff that if her complaints about the loan modification process were well-grounded then plaintiff's "home would not be foreclosed upon without the process starting anew." (Id. ¶ 100.)
(2) On April 27, 2017, Bennum spoke with plaintiff over the phone and stated "as an expression of solidarity that her experience with Wells Fargo's loan modification process was 'not okay.'" (Id. ¶ 128.)
(3) On April 28, 2017, Bennum told plaintiff about a meeting he attended with Franklin Codel, head of Consumer Lending for Wells Fargo, and with other senior executives regarding her loan.  Bennum told plaintiff that he had never attended another such meeting and that the meeting was a "big deal."  He said everyone at the meeting agreed plaintiff's experiences were not okay.  The Second Amended Complaint alleges that "Bennum solicited [p]laintiff's trust by sharing that

13

the consensus of the meeting was that Wells Fargo was
                    going to do everything they could to help plaintiff
                    keep her home." (Id.)

These facts suggest a frequency and intensity of interaction between plaintiff and Bennum that is atypical in the loan modification process. Bennum actively empathized with plaintiff by telling her that her experiences were "not okay" and solicited her trust by sharing the contents of a high-level corporate meeting with her. The Second Amended Complaint also sufficiently alleges that Bennum and plaintiff were in regular contact and that Bennum led plaintiff to believe that if any of her complaints regarding the revolving door of "single points of contact" or general mishandling of her application were true, then she would spared foreclosure until a new application could be properly evaluated.

Overall, these alleged facts distinguish plaintiff's relationship with Wells Fargo from a typical relationship between a lender and borrower. A comparison with Griffin v. Green Tree Servicing, LLC, No. CV-14-09408-MMM(VBKx), 2015 WL 10059081 (C.D. Cal. Oct. 1, 2015), is instructive. In Griffin, the court rejected plaintiff's argument that the defendants "stepped outside their conventional duties as a lender and servicer" when they "dispatched letters advertising mortgage assistance programs and undertook efforts to consider borrowers, including Plaintiffs, for loss mitigation options, including, but not limited to, loan modifications." See Griffin, 2015 WL 10059081, at *15. Here, unlike the plaintiff in Griffin, Flynn alleges that Bennum actively empathized with her by implicitly critiquing

his employer's previous handling of her application. She alleges that Bennum sought to convey that to her that her application, in particular, was receiving special treatment, i.e., by telling her it was a "big deal" that her situation was discussed at a meeting with high-level executives.

Collectively, these allegations indicate that plaintiff's experience in the loan-modification process with Wells Fargo was not "[a]n arm's length transaction between lender and borrower [that] does not create an actionable duty of care." See Jent v. N. Tr. Corp., No. CIV 13-01684 WBS CKD, 2013 WL 5806024, at *3 (E.D. Cal. Oct. 28, 2013) (citing Saldate v. Wilshire Credit Corp., 711 F. Supp. 2d 1126, 1132 (E.D. Cal. 2010) (O'Neill, J.)  The court thus finds that the Second Amended Complaint sufficiently alleges a special relationship between plaintiff and Wells Fargo that exceeds the bounds of the typical relationship between borrower and lender and gives rise to a duty of care.  The Second Amended Complaint also plausibly alleges that Wells Fargo breached that duty by acting negligently with respect to plaintiff's loan modification application.

The court's reasoning regarding causation, discussed in the context of plaintiff's fraud claim, also applies to the negligence claim.  Further, this claim encompasses broader conduct than the fraud claim.  The negligence claim is based on not only Bennum's misrepresentations, but also Wells Fargo's alleged misrepresentations in connection with its overvaluation of plaintiff's property in 2006 and the futility of plaintiff's appeal of her loan modification application denial, which allegedly prevented her from clearing up misapplied payments and

15

fees and obtaining private money to pay off her arrearage or refinance her loan. (SAC ¶¶ 138-140.) Taking these allegations as true, plaintiff has sufficiently alleged causation with respect to her negligence claim. Accordingly, the court will deny defendant's Motion to Dismiss plaintiff's negligence claim.

D. Wrongful Foreclosure

A claim for wrongful foreclosure generally requires that:
> (1) the trustee or mortgagee caused an illegal, fraudulent, or willfully oppressive sale of real property pursuant to a power of sale in a mortgage or deed of trust; (2) the party attacking the sale . . . was prejudiced or harmed; and (3) . . . the trustor or mortgagor tendered the amount of the secured indebtedness or was excused from tendering.

Rockridge Tr. v. Wells Fargo, N.A., 985 F. Supp. 2d 1110, 1145 (N.D. Cal. 2013) (quoting Lona v. Citibank, N.A., 202 Cal. App. 4th 89, 104 (6th Dist. 2011)).

Plaintiff alleges that Wells Fargo wrongfully foreclosed on the subject property because it "failed to properly process the documents, failed to use the proper income figures, and proceed with the foreclosure process and illegal dual tracking" and because it "had a revolving door" of single points of contact in violation of California Civil Code Sections 2923.6 and 2923.7. (SAC ¶¶ 148-155.) While the Second Amended Complaint alleges that defendant did not in fact have authority to modify her loan, (see, e.g., SAC ¶ 100(a)), plaintiff has sufficiently alleged that she would have been able to pursue private loans to prevent the foreclosure of her home, if these various acts by defendant had not kept her "tangled up in the modification process," (see SAC ¶ 151). Accordingly, the court will deny the

16

Motion to Dismiss the wrongful foreclosure claim.

      E.    UCL Claim

A private person has standing to sue under California's Unfair Competition Law if she can "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., economic injury, and (2) show that that economic injury was the result of, i.e., caused by, the unfair business practice or false advertising that is the gravamen of the claim." Kwikset Corp. v. Superior Ct., 51 Cal. 4th 310, 322 (2011) (emphasis removed). "A plaintiff cannot show causation if she would have suffered 'the same harm whether or not a defendant complied with the law.'" London v. Wells Fargo Bank, N.A., No. 2:17-CV-00687 KJM AC, 2018 WL 621262, at *10 (E.D. Cal. Jan. 29, 2018) (quoting Daro v. Superior Ct., 151 Cal. App. 4th 1079, 1099 (1st Dist. 2007)).

Like plaintiff's wrongful foreclosure claim, plaintiff's UCL claim plausibly alleges that her injuries were caused by defendant's unfair business practices. The Second Amended Complaint sufficiently alleges that had defendant not engaged in various practices such as failing to process documents, failing to provide a single point of contact, failing to use improper income figures, and illegally dual tracking, plaintiff could have pursued private money loans and prevented her foreclosure. (See, e.g., SAC ¶¶ 160-163.) Accordingly, the court will deny the Motion to Dismiss the UCL claim.

      F.    Punitive and Treble Damages

Defendant seeks to dismiss the Second Amended

Complaint's requests for punitive damages and treble damages.[4] Pursuant to California Civil Code section 3294, a plaintiff may recover punitive damages "[i]n an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294(a). Meanwhile, the California Homeowners Bill of Rights provides for trebled actual or statutory damages for material violations that were intentional, reckless, or resulted from willful misconduct. Cal. Civ. Code § 2924.12(b).

Because the court has already determined that the Second Amended Complaint sufficiently alleges a claim for fraud, the court will deny the motion to dismiss the request for punitive damages. Further, taking plaintiff's allegations as

---

[4] Defendant seeks in the alternative to strike the request for punitive and treble damages. Federal Rule of Civil Procedure 12(f) permits the court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The Ninth Circuit has made clear, however, that "Rule 12(f) does not authorize district courts to strike claims for damages on the ground that such claims are precluded as a matter of law." Whittlestone, Inc. v. Handi-Craft Co., 618 F.3d 970, 974-75 (9th Cir. 2010). Following Whittlestone, courts in this district have declined to strike prayers for unavailable forms of relief. See, e.g., Estate of Prasad ex rel. Prasad v. Cty. of Sutter, 958 F. Supp. 2d 1101, 1128 (E.D. Cal. 2013) (Nunley, J.) ("Plaintiffs' prayer for punitive damages satisfies 'none of the five categories' of material that may be stricken under Rule 12(f)." (alterations omitted)). The court follows this approach and thus declines to strike the Second Amended Complaint's requests for punitive and treble damages, though it will consider whether to dismiss them under Rule 12(b)(6). See Price Simms Holdings LLC v. Candle3, LLC, No. 2:18-cv-1851 WBS KJN, 2019 WL 2024597, *3-4 (E.D. Cal. May 8, 2019) (declining to strike request for punitive damages but dismissing them as unavailable as a matter of law given plaintiff's remaining claims).

18

true, plaintiff has plausibly alleged that defendant acted recklessly by dual tracking and failing to provide a single point of contact. Accordingly, the court declines to dismiss the Second Amended Complaint's request for treble damages.

IT IS THEREFORE ORDERED that defendants' Motion to Dismiss (Docket No. 24) be, and hereby is, DENIED.

Dated: August 29, 2019

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE